UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GENESIS SANTANA LOPEZ, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * Civil Action No. 16-cv-10945-ADB |
| CAROLYN COLVIN, | * |
| *Commissioner of Social Security*, | * |
| | * |
| Defendant. | * |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff Genesis Santana Lopez ("Claimant") brings this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for review of the partially favorable decision of the Commissioner of the Social Security Administration (the "Commissioner"), regarding her claims for childhood disability benefits. Specifically, although Claimant was awarded benefits from April 12, 2014 forward, she was denied benefits from May 29, 2012 to April 12, 2014. Currently pending is Claimant's motion to reverse the Commissioner's decision denying her disability benefits beginning May 29, 2012 [ECF No. 16] and the Commissioner's motion for an order affirming the decision [ECF No. 21]. For the reasons described herein, the Court concludes that the decision was supported by substantial evidence and therefore DENIES Claimant's motion to reverse and ALLOWS the Commissioner's motion to affirm.

I.  BACKGROUND

    A.  **Statutory and Regulatory Framework**

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for

covered workers, and the Supplemental Security Income program, which provides assistance for the indigent aged and disabled." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a). The Social Security Act provides that an individual shall be considered to be "disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); see also 42 U.S.C. § 423(d)(1)(A). The disability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy. See 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905.

When evaluating a disability claim for an individual under the age of eighteen, the Commissioner utilizes a three-step sequential evaluation process. 20 C.F.R. § 416.924; see also Pagan ex rel. A.C. v. Astrue, 718 F. Supp. 2d 176, 181 (D. Mass. 2010). First, the Commissioner must determine whether the child is engaging in "substantial gainful activity." Id. (citing Beliveau v. Apfel, 154 F. Supp. 2d 89, 93 (D. Mass 2001) and 20 C.F.R. § 416.924(b)). If the individual is not engaging in substantial gainful activity, the Commissioner must next determine whether the child has an impairment (or a combination of impairments) that is "severe." 20 C.F.R. § 416.924(c). Third, the Commissioner must determine whether the impairment meets, medically equals, or functionally equals an impairment listed in the "Listing of Impairments." 20 C.F.R. § 416.924(d). If the child's impairment does not meet, medically equal, or functionally equal a "listed" impairment, the child will be deemed "not disabled." § 416.924(d); see also Pagan ex rel A.C., 718 F. Supp. 2d at 181. If a child cannot qualify under the listings, 20 CFR pt. 404, subpt. P, App. 1 (pt. B), she is denied benefits. Id.

## B. Procedural Background

Claimant filed her application for childhood disability benefits on May 29, 2012, alleging that she become disabled as of the same date due to seizures, headaches, and bone pain. [R. 21].[1] The Social Security Administration (the "SSA") initially denied Claimant's application for childhood disability benefits on August 14, 2012, and again upon reconsideration on June 18, 2013. [R. 124]. Thereafter, Claimant requested an administrative hearing, and a hearing took place before Administrative Law Judge ("ALJ") Eric Eklund on October 14, 2014. [R. 17]. Claimant, who was represented by counsel, appeared and testified at the hearing. James Conway, an independent vocational expert, also appeared and testified. [R. 124]. On November 28, 2014, the ALJ issued a decision finding that Claimant was not disabled as of May 29, 2012, but that she became disabled after April 12, 2014, and before attaining age eighteen. [R. 139]. The SSA Appeals Council denied Claimant's request for review on March 24, 2016, at which point the ALJ's decision became final and subject to judicial review. Accordingly, on May 24, 2016, Claimant filed a timely complaint with this Court [ECF No. 1], seeking to reverse the Commissioner's decision pursuant to section 205(g) of the Act [ECF No. 16]. On December 21, 2016, Defendant Carolyn Colvin filed a motion to affirm the Commissioner's decision. [ECF No. 21].

## C. Factual Background

Claimant was born on August 26, 1996, and fell under the "adolescents" age group at the time of the alleged onset date for her disability. [R. 129]. During the time of her alleged onset date, Claimant was one month shy of turning sixteen years old, attending Lowell High School,

---

[1] References to pages in the Administrative Record, which were filed electronically at ECF No. 11, are cited as "[R. __]."

and living with her mother and her father. [R. 39–40, 94]. She often went shopping for groceries and clothing with her mother, did her homework, and cooked and cleaned. [R. 40–41]. During her time as a student, she did not work and therefore had no work history. [R. 129]. She reached age eighteen on August 26, 2014. Id. Claimant has not objected to the ALJ's finding of disability as of April 12, 2014, but does challenge the finding that she was not disabled as of May 29, 2012.

### D. Medical Evidence

From March 2011 to May 2012, Claimant occasionally made visits to a nurse practitioner, Kristen Padulsky, for treatment related to her headaches. On three separate occasions, in March 2011, September 2011, and again in May 2012, the nurse examined Claimant, and found that she had good coordination in standing and walking [R. 501, 504, 507], noting that Claimant appeared "generally healthy" [R. 501], and had a "full range of motion" [R. 507].

On June 3, 2012, Claimant went to the emergency room following a seizure. [R. 436]. While there, she stated that her last seizure was approximately nine months earlier. She also reported mild headaches that were resolved with an anti-inflammatory drug. [R. 436]. Upon discharge, the hospital noted that Claimant had a seizure disorder. [R. 439].

On June 5, 2012, Claimant followed up with her pediatrician, Cathleen Bonacci, M.D, complaining of pain and swelling in her leg, as well as headaches. Dr. Bonacci started Claimant on Naproxen for the headaches. [R. 463]. She noted that Claimant was also taking antiepileptic medications, but deferred to Tufts Neurology for determinations on the medication that she should take regarding her seizures. [R. 463, 542].

In July 2012, Claimant reported back to Dr. Bonacci, complaining of the headaches and left knee pain. Dr. Bonacci started Claimant on amitriptyline medication for the headaches, and referred her for laboratory testing to determine the nature of the knee pain. [R. 538–39].

On August 3, 2012, Claimant saw a neurologist, Douglas Hyder, M.D. She reported to Dr. Hyder that she only had break-through seizures if she skipped taking her medication, and that she had headaches two to three times per week. [R. 508]. He put her on a lower dose of Celexa, after noting that higher doses can be associated with seizures, but that lower doses are not. [R. 509]. On August 30, 2012, she again visited Dr. Bonacci, reporting headaches that began with loss of vision and feeling dizzy. [R. 530].

In January 2013, Claimant visited Laurie Miller, M.D., with complaints of joint pain in her left knee that radiated up to the hip. [R. 566]. At this time, Claimant had rare nocturnal pain that worsened with activity and occasional limping, as well as slight wrist pain when opening a jar, cleaning, and doing dishes. Id. Dr. Miller noted that Claimant was able to attend school daily, that she participated in modern dance at school, that her grades were "B's and C's," and that she was interested in going to college. Id.

On April 5, 2013, Claimant reported again to Nurse Padulsky regarding her headaches, pain, and visual changes that caused her to miss as many as thirty days of school. [R. 580]. The nurse wrote that Claimant missed two appointments with Dr. Hyder, the neurologist, and despite being advised to do so, had not followed up with him since the visit in August 2012. Id. She further noted that Claimant wanted to be a marine biologist, and was a "good student, A's [and] B's." [R. 581].

On May 3, 2013, Claimant presented to Purnima Baranwal, M.D., complaining that she was stiff and had pain in the morning in her left knee, and that she had missed school due to the

pain because Tylenol was not working. [R. 516]. On May 16, 2013, during an appointment at Tufts Medical Center, Claimant reported joint pain that caused her to leave school early five to six times. [R. 572]. The record indicates that, during this visit, Claimant stated she feels "ok" a couple times per week. Id. She also reported that she was active in dance at school and that it was going well. Id.

On July 18, 2013, Claimant told Dr. Bonacci that she missed school forty-two times that year due to her headaches. [R. 726–27]. During this visit, Dr. Bonacci noted that Claimant has seizures, and that she had had one two days earlier. [R. 727].

On August 1, 2013, Claimant reported to Kiran Kulkarni, M.D. regarding increased frequency in her leg pain. Dr. Kulkarni noted that Claimant was not attending her prescribed physical therapy sessions and was not taking the prescribed Naprosyn. [R. 575]. Later that month, on August 13, 2013, Claimant saw Nurse Padulsky. [R. 589]. The nurse noted that although she had had a seizure roughly one month earlier, Claimant reported that she was "seizure-free" since her medication dosage was increased. Id.

On September 20, 2013, in a follow-up visit with the nurse, Claimant again reported no further breakthrough seizures since the increased dosage, and also reported significant improvements in her headache symptoms since beginning a new medication. [R. 594]. Nurse Padulsky wrote that Claimant had run out of the medication several days before the visit, and that the headaches had thus returned, but noted that Claimant wanted to continue taking this medication because it provided "excellent headache relief." Id.

On January 9, 2014, Claimant told Dr. Bonacci that she had a seizure a few days earlier where she fell out of bed, and that she had missed thirty-three days of school that year. [R. 746].

6

On January 30, 2014, she presented to Tufts Medical Center with complaints of a headache and vertigo, stating that she felt dizzy prior to her episodes. [R. 605].

On March 3, 2014, Dr. Bonucci noted that Claimant was being tutored at home until she stabilized from her seizure conditions, after she had an episode where she stiffened and had a headache with weakness. [R. 754–55].

On April 15, 2014, Claimant saw Dr. Bonucci following a seizure she had had on or around April 12, 2014, where she fell on her face at a laundromat. [R. 756]. She also reported daily headaches and that she was going to have to repeat the 11th grade because her grades were poor. Id. A CT scan of Claimant's brain, taken at Lowell General Hospital on April 12, 2014, indicated "head trauma" from Claimant's recent seizure. [R. 963].

On April 25, 2014, Claimant had an appointment with Dr. Hyder at Tufts Medical Center due to the increased severity in her seizures. [R. 691]. Claimant explained to Dr. Hyder that she had been out from school for the past two weeks due to the seizures, that she had headaches "all the time," and that she was worried she would not advance to her senior year of high school. Id. Dr. Hyder noted that Claimant had about "twenty seizures in total over the past four years," but that she had experienced three seizures alone in January, March, and April of 2014. Id.

On May 9, 2014, Dr. Hyder wrote a letter to Claimant's school stating that she was being treated for epilepsy, it was not well-controlled, and that it was medically unsafe for her to attend school at this time. [R. 869]. Dr. Hyder then requested a home tutor so that Claimant could complete her studies while she was being treated. Id.

## II. THE ALJ'S DECISION

On November 28, 2015, the ALJ issued a decision finding that Claimant was not disabled prior to April 12, 2014, but that she became disabled on or about April 12, 2014 because the

7

medical records since April 12, 2014 reflected an increase in the frequency and severity of her seizures and headaches, despite compliance with her medications since April 12, 2014. The ALJ stated that he considered all symptoms and objective medical evidence, and gave substantial weight and credibility to the opinion of the neurologist, Dr. Hyder, when he noted that her epilepsy was no longer well-controlled as of April 12, 2014. [R. 130–31].

The ALJ applied the three-step sequential evaluation process set forth by the relevant regulations to determine whether a child is disabled. 20 C.F.R. § 416.924(a). At step one, he found that Claimant had not engaged in substantial gainful activity after May 29, 2012, the date the application was filed. [R. 129]. At step two, the ALJ found that, before attaining age eighteen, Claimant had medically "severe" impairments of epilepsy, headaches, obesity, and patellofemoral syndrome, but that Claimant did not have an impairment that met or "medically equaled" any of the listed impairments in the regulations. Id.; 20 C.F.R. Pt. 404, App. 1. Finally, at step three, the ALJ found that, as of the alleged onset date of May 29, 2012, Claimant did not have an impairment that "functionally equaled" any of the listed impairments. [R. 129].

The ALJ did find that, after April 12, 2014 and before Claimant attained age eighteen, she had an impairment that functionally equaled the listed impairments because she had an "extreme limitation" in the domain of health and physical well-being.[2] He found that this limitation became "extreme" as of this date as a result of the increased severity and frequency of Claimant's seizures and headaches. [R. 136–37]. Further, the ALJ noted that the medical records at this time reflected an extreme limitation because Claimant had begun reporting headaches all

---

[2] In determining the functional equivalency of a listed impairment, the ALJ looks at the claimant's functioning in six domains, one of which is physical health and well-being. 20 C.F.R. § 416.926a(d). If the ALJ finds that a claimant has an "extreme" limitation in one of these domains, the child qualifies as disabled.

8

day, had a significant fall at the laundromat on April 12, 2014 during a seizure, and there was limited evidence of non-compliance with her medications since April 12, 2014. Id. The ALJ also noted that he gave significant weight to the opinion of Dr. Hyder when he indicated that it would be medically unsafe for Claimant to attend school at this point. [R. 137]. Based on the record, the ALJ then determined that Claimant was disabled within meaning of the Act and regulations as of April 12, 2014.

### III. STANDARD OF REVIEW

Section 205(g) of the Social Security Act provides that an individual may obtain judicial review of a final decision of the Commissioner of Social Security by instituting a civil action in federal district court. See 42 U.S.C. § 405(g). The district court may take a number of actions with respect to the Commissioner's decision. First, under sentence four of section 205(g), the court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner. See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting 42 U.S.C. § 405(g)). If a claimant presents new evidence to the court that was not contained within the administrative record, the court may not consider it. "If additional evidence is to be considered, it must be by way of remand" pursuant to sentence six of section 205(g). Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1503 (10th Cir. 1992). Sentence six permits the court to remand a case to the Commissioner for further proceedings and order the evidence to be added to the record for consideration. See 42 U.S.C. § 405(g) ("The court may . . . at any time order additional evidence to be taken before the Commissioner . . . but only upon a showing that there

9

is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .").

Under section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). In conducting such a review, the Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the Court's review of the Commissioner's conclusions of law is *de novo*. Id.; see also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, (1938)). The Court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec. of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (citing Lizotte, 654 F.2d at 128).

## IV. DISCUSSION

The ALJ undertook the appropriate three step analysis. After concluding steps one and two of the sequential analysis, the ALJ turned to step three, which is at issue here. At step three, the ALJ determined that Claimant did not have an impairment (or combination of impairments) that "met or medically equaled" one of the listed impairments. [R. 129]. Thus, the ALJ's analysis turned on whether Claimant had an impairment that "functionally equaled" a listed impairment.

In evaluating whether a child's impairment "functionally equals" a listed impairment, the ALJ looks at six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). To functionally equal the listings, an impairment must result in "marked" limitations in two of the domains, or an "extreme" limitation in one domain. Id. § 416.926a(a).

A child has a "marked" limitation when the impairment interferes "seriously" with her ability to independently initiate, sustain, or complete activities. Id. § 416.926a(e)(2). The regulations further specify that a "marked" limitation means "a limitation that is 'more than moderate' but 'less than extreme,'" such that "[i]t is the equivalent of the functioning [one] would expect to find on standardized testing with scores that are at least two . . . standard deviations below the mean." Id. A child has an "extreme" limitation when her impairment interferes "very seriously" with her ability to independently initiate, sustain, or complete activities. Id. § 416.926a(e)(3). An "extreme" limitation means a limitation that is "more than marked" and is the rating "give[n] to the worst limitations." Id. An extreme limitation "does not necessarily mean a total lack or loss of ability to function," but is the equivalent of functioning one would expect to find on standardized testing with scores that are at least three standard deviations below the mean." Id. In making these determinations, the ALJ considers all relevant factors, including but not limited to: (1) how well the child can initiate and sustain activities, how much extra help she needs, and the effects of structured or supportive settings; (2) how she functions in school; and (3) the effects of her medications or other treatment. See §§ 416.924a(b)(5), (7), and (9); § 416.926a.

11

After determining that the child did not have "marked" limitations in two domains or an "extreme" limitation in one domain, the ALJ concluded that Ms. Lopez did not have an impairment that "functionally equaled" a listed impairment prior to April 12, 2014, and was consequently not disabled prior to this date. Claimant argues that the ALJ's determination should be reversed because he failed to properly consider her functioning in four of the six domains: acquiring and using information; attending and completing tasks; moving about and manipulating objects; and health and physical well-being. [ECF No. 16]. As explained more fully below, the Court concludes that the ALJ's decision concerning each domain was supported by substantial evidence.

### A. Acquiring and Using Information

The domain of acquiring and using information examines how well a child is able to learn information, and how well she uses the information that she has learned. 20 C.F.R. § 416.926a(g). For claimants in the adolescent age group, this includes, among others, the abilities to: demonstrate what she has learned in academic assignments; use what she has learned in daily living situations without assistance (e.g., going to the store, using the library, using public transportation); and comprehend and express both simple and complex ideas in learning and daily living situations. 20 C.F.R. § 416.926a(g)(2)(v).

The ALJ found that Claimant had a "less than marked limitation" in this area because the record suggested, for the most part, A and B grades. [R. 132]. Further, although Claimant did not finish the eleventh grade, the ALJ noted that this was not due to a lack of acquiring and using information. Id. Lastly, he explained that the Individualized Education Program ("IEP") from the school was an accommodation for Claimant's safety and care, rather than for any academic needs. Id. Claimant argues that the ALJ's finding in this regard is flawed because it is based on

an incorrect statement of the facts, and it did not take into account her absenteeism from school or her failing grades.

Claimant would like the Court to rely on the SSA's policy interpretation, which explains that "in some cases, chronic absence from school may result in limitations we also evaluate in the domain of 'Acquiring and Using Information.'" SSR 09-8p, 2009 WL 396030, at *3 (S.S.A. Feb. 17, 2009). The fact that Claimant was frequently absent from school, however, does not alone demonstrate a marked limitation in this domain. See, e.g., J.B. ex rel Barboza v. Astrue, 738 F. Supp. 2d 260, 265–66 (D. Mass. 2010) (upholding finding of a less than marked limitation despite the record showing that claimant both struggled academically and frequently missed school). Here, although the record suggested some poor and failing grades, Claimant did not show that her symptoms resulted in an inability to learn and use information, such as an inability to pay attention in school, remember what she was learning, or demonstrate what she had learned in academic assignments and daily living situations. Cf. Martinez ex rel. J.R.M. v. Astrue, No. 11-30258-KPN, 2012 WL 2914427, at *4 (D. Mass. June 25, 2012) ("[a] mere showing that [claimant] struggles academically . . . is insufficient to sustain a finding of marked limitation in the domain of using and acquiring information."). The record indicates that when Claimant did attend school, she was a good student, achieved A's, B's, and C's, and was interested in attending college. [R. 566, 581]. Further, on January 19, 2013, her mother noted that Claimant could "read and understand stories in books," "multiply and divide numbers over 10," "understand[ ] money," and "understand, carry out, and remember simple instructions." [R. 305]. An ALJ's findings must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health &

Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). In this case, the evidence in the record as a whole supports the ALJ's conclusion that Claimant had less than marked limitations in the domain of acquiring and using information.

    **B.    Attending and Completing Tasks**

Attending and completing tasks refers to how well a child can focus and maintain attention, and how well she can begin, carry through, and finish activities. 20 C.F.R. § 416.926a(h). An adolescent without an impairment should be able to pay attention during long presentations and discussions, maintain concentration when reading, and complete school tasks and assignments. Id. § 416.926a(h)(2)(v). Further, the child should not be unduly distracted by, or distracting to, peers in a school setting. Id. The regulations further set forth some examples of limitations in this domain, but note that the examples do not necessarily constitute "marked" or "extreme" limitations on their own. Id. § 416.926a(h)(3). Those examples of difficulties include: being easily startled, distracted, or over-reactive to sounds, movement, and touch; a failure to complete activities of interest, like games and art projects; frequently interrupting others and getting sidetracked; requiring extra supervision; and being easily frustrated and giving up on tasks before completing them. Id.

Claimant contends that the ALJ improperly concluded that prior to April 12, 2014, she had "less than marked limitations," and she again cites her failing grades as evidence of her inability to attend and complete tasks. In support of the finding in this domain, the ALJ stated that Claimant had relatively good grades when she attended school. [R. at 133]. He also noted the non-compliance with her prescribed medication regimen, the failure to keep a headache diary as requested by Nurse Padulsky, and an infrequency of seizures and symptoms when she was compliant with her medication. Id. The conclusion that she had less than marked limitations in

14

attending and completing tasks is supported by the record. For example, on June 15, 2012, Claimant's mother reported that she could "finish things that . . . she starts," "completes homework on time," and "completes chores most of the time." [R. 307–309]. Dr. Griesemer also wrote, after examination, that she "demonstrates appropriate memory, language, and attention skills," and that her "school performance is good." [R. 496]. Further, Claimant reported that she enjoyed and continued with the dance team [R. 572], and there were no indications that she had trouble concentrating or was distracting to her peers at school. Although the record shows that Claimant had some poor grades, "the existence of 'some evidence contrary to the ALJ's findings does not extinguish the substantial evidence supporting the ALJ's findings.'" Martinez ex rel. J.R.M., 2012 WL 2914427, at *4 (quoting Greene v. Astrue, 2012 WL 1248977, at *3 (D. Mass. Apr. 12, 2012)). In addition, Claimant has not demonstrated that her poor grades were due to an inability to attend to and complete tasks.

In determining the functional equivalency of a listed impairment, the ALJ is to consider the effects of the claimant's medications or other treatment. See § 416.924a(b)(9); see also Skellie v. Colvin, No. 14-CV-00010-PB, 2015 WL 858357, at *3 (D.N.H. Feb. 27, 2015) (affirming the ALJ's determination of ineligibility for SSI benefits because, *inter alia*, the claimant's symptoms abated with the use of prescribed medication). Claimant argues that the ALJ "cherry-picked" evidence to support a finding that she was non-compliant. [ECF No. 16 at 15; R. at 589]. There were, however, numerous occasions in the record indicating that Claimant was non-compliant with the doctors' and nurse's orders during the relevant time period. For example, Dr. Miller noted that Claimant did not go to her prescribed physical therapy sessions [R. 575] and Nurse Padulsky noted on numerous occasions that Claimant "was not taking her medications as prescribed," "had not been taking her medication regularly," "missed both

15

appointments," and had not followed up with Dr. Hyder as advised. See [R. 504, 597, 598, 580]. Further, the nurse wrote that she had "concerns related to [Claimant] missing frequent appointments and not following recommendations for follow up or medication changes." [R. 583]. Lastly, for proper treatment, the nurse asked Claimant to complete a headache diary so that her team of physicians could observe how often the headaches occur, if they follow a pattern, or are caused by certain triggers [R. at 583], but the subsequent record indicated that she never did so. Claimant reported excellent relief when she did take her prescribed headache medication. [R. 594].

To counter the ALJ's conclusion regarding non-compliance, Claimant argues that Dr. Bonacci did not, in her treatment notes, discuss any non-compliance, which results in an underlying conflict that the ALJ did not resolve. [ECF No. 16 at 17]. The fact that one doctor never recorded any non-compliance, however, is not affirmative proof that Claimant was compliant. In reviewing the record, the ALJ "can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." NLRB v. Beverly Enters.–Mass., Inc., 174 F.3d 13, 26 (1st Cir. 1999); see also Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence."); cf. Nguyen v. Callahan, 997 F. Supp. 179, 182 (D. Mass. 1998) ("the Commissioner, not the reviewing court, must determine issues of credibility, draw inferences from the record and resolve conflicts of the evidence."). That one doctor never recorded any non-compliance is not enough to prove that the ALJ's decision was contrary to the evidence. Here, the ALJ adequately explained his findings, and the evidence that he referenced supported his conclusion. Given the objective medical and treatment records from several practitioners, as well

16

as the forms filled out by her mother during the relevant period, there was substantial evidence to conclude that Claimant had less than marked limitations in this domain.

### C. Moving About and Manipulating Objects

The domain of moving about and manipulating objects refers to how well a child is able to move her body from one place to another, which relates to both gross and fine motor skills. 20 C.F.R. § 416.926a(j). The regulations provide that an adolescent should, among other things, be able to: use her motor skills freely to get about her school, neighborhood, and the community; participate in a range of individual and group physical fitness activities; and have the fine motor skills needed to write efficiently or type on a keyboard. Id. § 416.926a(j)(2)(v).

In this domain, the ALJ determined that Claimant had "no limitation," reasoning that the record reflected insufficient, if any, evidence of limitations in moving about and manipulating objects. [R. 134]. Claimant contends that this determination is not supported by substantial evidence because the ALJ's conclusion conflicts with his earlier finding at step two of the process that Claimant's obesity and patellofemoral syndrome were "severe" impairments, making them, by definition, more than minimal functional limitations.[3] A "marked" limitation in any given domain is found when an impairment interferes "seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). Further, a "marked" limitation means "a limitation that is 'more than moderate' but 'less than extreme.'" Id. Here, Claimant's reliance on the SSA's policy interpretation as to what constitutes a finding of severe obesity does not negate the ALJ's finding that she had no "marked" limitations in this

---

[3] The SSA's policy interpretation on obesity notes that for children, "obesity is a 'severe' impairment when it causes more than minimal functional limitations." See SSR 02-1p, 2002 WL 34686281, at *4 (S.S.A. Sept. 12, 2002); see also 20 C.F.R. § 416.924(c) (an impairment will not be found to be severe if it causes "no more than minimal functional limitations").

17

domain. Further, Claimant's cursory references to a few occasions on the record where she had some pain when doing dishes, walking, or opening jars does not indicate that she had a limitation that interfered "seriously" with her ability to function in this domain. Here, the ALJ properly focused on the symptoms, objective medical evidence, and functionality of the Claimant in the domain of moving about and manipulating objects, and his conclusion that she did not have a "marked" limitation is supported by substantial evidence on the record.

For example, on August 30, 2012, Dr. Bonucci examined Claimant and noted that she was oriented and interactive, in no obvious pain, with normal gait, and symmetric muscle tone, strength and reflexes. [R. 531]. Claimant points to the fact that she occasionally had issues including limping, pain when doing dishes, and opening jars, however, Nurse Padulsky noted that this pain subsided when she took two Advil. [R. 566]. Claimant also notes that she reported that she had pain in her left knee that travelled to her hip [R. 566] and that sometimes she could "barely walk." [R. 575]. This was also, however, in the same appointment that Dr. Miller noted that she did not go to physical therapy as prescribed. [R. 575]. Moreover, she was active in dance, and was partaking in a dance show. [R. 572]. Although the ALJ's discussion in this domain was brief, his discussion of the record as a whole was thorough. Further, there was substantial evidence in the record to support the ALJ's finding in the domain of moving about and manipulating objects, and consequently, the Court must uphold his conclusion.

### D. Health and Physical Well-Being

Lastly, the ALJ found that Claimant had marked limitations in the domain of health and physical well-being. [R. at 136]. Claimant avers that this finding is not supported by substantial evidence because the ALJ failed to explain how he arrived at this conclusion or why he did not find that the limitations in this domain were "extreme." A child has "marked limitations" in the

18

domain of health and physical well-being if she is frequently ill because of the impairments, or if she has frequent exacerbations of the impairments resulting in significant, documented symptoms or signs. 20 C.F.R. § 416.926a(e)(2)(iv). For the purposes of this domain,

> [f]requent means that you have episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more. We may also find that you have a "marked" limitation if you have episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks, or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity.

Id. Further, a child has "extreme limitations" if she has symptoms that are substantially in excess of the requirements for showing a "marked limitation." Id. § 416.926a(e)(3)(iv). If the child has episodes of illness or exacerbations of an impairment(s) that would rate as "extreme" under this definition, the impairment(s) should meet or medically equal the requirements of a listing in most cases. Id. §§ 416.925, 416.926.

Here, the impairments did not meet or medically equal the requirements of a listing, lending credence to the ALJ's finding that Claimant did not have "extreme limitations" in this domain at the time. Id.; see also Canales ex rel. Pagan v. Astrue, No. CIV.A.07-474ML, 2009 WL 2059716, at *6 (D.R.I. July 13, 2009) ("An ALJ does not err by finding that a claimant does not meet or equal a listing where no medical opinion substantiates that the claimant's condition meets or equals a listing."). The ALJ stated that the objective medical evidence in the record showed that around the alleged onset date, Claimant saw relief in her headaches, had not had a seizure in a year, and was doing well in school with treatment. [R. 130]. He noted that the frequently missed appointments and non-compliance with the prescribed treatment diminished the credibility of any allegations that the symptoms and limitations were disabling. [R. 131]. The ALJ wrote that he gave significant weight and credibility to Dr. Hyder when the doctor opined that, in May 2014, it would not be medically safe for the claimant to attend school, reflecting the

19

shift from "marked" to "extreme" limitations in health and physical well-being after April 12, 2014. [R. 137]; see Yongo v. INS, 355 F.3d 27, 32 (1st Cir. 2004) ("[T]he ALJ, like any fact-finder who hears the witnesses, gets a lot of deference on credibility judgments."). This shift occurred around the same time that the objective medical record reflected an increase in frequency and severity of seizures. Claimant's argument that the ALJ erred in finding that she had a marked, rather than an extreme, limitation in the domain of health and physical well-being is unconvincing because substantial evidence in the record supports a finding of marked limitation, rather than extreme limitation, prior to April 12, 2014.

## IV. CONCLUSION

Accordingly, the Court finds that the ALJ's decision was supported by substantial evidence and therefore DENIES Claimant's motion to reverse [ECF No. 16] and ALLOWS the Commissioner's motion to affirm [ECF No. 21].

**SO ORDERED.**

May 24, 2017 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE